IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


DEMPSEY ELLISON                :        CIVIL ACTION
                               :
        v.                     :
                               :
OAKS 422 LLC, et al.           :        NO. 11-2943


MEMORANDUM

Bartle, J.                                    March 15, 2012

        Plaintiff Dempsey Ellison ("Ellison") has filed this
action under the Family and Medical Leave Act ("FMLA"), 29 U.S.C.
§ 2601 et seq. against his former employers Oaks 422 LLC
("Oaks"), Langhorne Route 1 LLC ("Langhorne"), New Venture
Holdings LLC ("New Venture"), and Haynes Furniture Company Inc.
("Haynes").[1]  Ellison alleges the defendants violated the FMLA by
considering his medical leaves of absence, which were approved
under the FMLA, in their decision to terminate Ellison.  Before
the court is a motion for summary judgment filed by the
defendants under Rule 56 of the Federal Rules of Civil Procedure.

                               I.

        Summary judgment is appropriate "if the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and

_____

1.  Haynes is a subsidiary of New Venture, and Oaks and Langhorne
are the corporate names of two furniture stores operated by
Haynes and New Venture.

that the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477
U.S. 317, 323 (1986).  A dispute is genuine if the evidence is
such that a reasonable jury could return a verdict for the non-
moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254
(1986).  Summary judgment is granted where there is insufficient
record evidence for a reasonable jury to find for the plaintiffs.
Id. at 252.  "The mere existence of a scintilla of evidence in
support of the plaintiff's position will be insufficient; there
must be evidence on which the jury could reasonably find for the
plaintiff."  Anderson, 477 U.S. at 252.  We view the facts and
draw all inferences in favor of the non-moving party.  Boyle v.
Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).  When
ruling on a motion for summary judgment, we may only rely on
admissible evidence.  See, e.g., Blackburn v. United Parcel
Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999).

II.

The following facts are undisputed or taken in the
light most favorable to Ellison as the non-moving party.  The
furniture stores operated by Haynes, through its subsidiary New
Venture, are known as "The Dump."  The Dump has one store in
Oaks, Pennsylvania and another in Langhorne, Pennsylvania.[2]

---

2.  At all times during Ellison's employment, the defendants
employed a minimum of 50 employees within a 75 mile radius.
Further, Ellison was employed full-time by the defendants at all
relevant times.  There is thus no dispute regarding whether
Ellison is an eligible employee under 29 U.S.C. § 2611.

Ellison was hired on January 6, 3003 as a furniture handler at the Langhorne store.  He was promoted to a Customer Pick Up Supervisor at Langhorne on February 2, 2003 and then to a Warehouse Manager at Langhorne on May 19, 2003.  On February 1, 2007, he was advanced to the position of Customer Pick Up Manager at Langhorne.

While in this last position, Ellison received written disciplinary actions from the defendants on March 13, 2009, April 26, 2009, and June 19, 2009.  In September of 2009, Ellison was transferred from the Langhorne store to the store in Oaks.  There, he remained a Customer Pick Up Manager, but he had less responsibility because it was a smaller store.  As Customer Pick Up Manager in the Oaks store, Ellison supervised the furniture handlers in the warehouse as well as a Customer Pick Up clerk.  The purpose of the transfer was to give Ellison less responsibility as the result of the performance-related disciplinary actions.  The transfer was a demotion which resulted in a decrease in his salary.  The September 25, 2009 documentation of his transfer notified Ellison:

> You have failed to display the ability to
> perform and meet the expectations listed
> below and described in your final warning
> given 8-21-09.  We are going to reassign you
> to another operation as a CPU Manager where
> you will have less responsibility.... We hope
> that the change of environment and change of
> responsibility will result in a positive
> change in your performance.  If there is no
> improvement you will be further disciplined
> up to an including termination.

When Ellison was transferred to the Oaks store, his supervisor was Claude Neptune, the Inventory Control Manager, and the Store Manager was Dave Frankel.  On October 4, 2009, Neptune notified Ellison that he was being placed on a Performance Improvement Plan (PIP).  The defendants use PIPs to document issues in an individual employee's performance, to describe the employer's expectations of the employee, to provide a time frame in which changes must occur, and to identify what discipline might occur if improvement did not take place.  The October 4, 2009 PIP stated, "[t]hese expectations need to be met or you will be disciplined up to and including termination."

New Venture hired Mark Nace as Regional Operations Manager on May 1, 2010, and he replaced Neptune as Ellison's immediate supervisor.  Nace and Ellison had various conflicts throughout their employment relationship.  For example, Nace asked Ellison to prepare productivity reports that Neptune had not asked of Ellison.  Ellison did not prepare the reports despite Nace's further request, and Nace accordingly assigned them to another employee.  Ellison has testified that he did not produce the productivity reports because he was busy with other tasks.

Nace periodically told Ellison when his job performance was not satisfactory.  Some of this is documented in emails, including two in May of 2010, prior to Ellison's medical leave in June.  In one of these emails, Nace wrote to him that "[t]he out times are missing on the punch sheet."  In the other, Nace

-4-

requested that he make sure he locked the building before leaving on the weekends.

The defendants' leave policy complied with FMLA requirements.  When an employee requested a leave of absence from his supervisor, the supervisor would refer the employee to the Benefits Manager, who would approve or deny the request.  During the relevant time frame, Shirley DiDomenico was the Benefits Manager responsible for administration of the FMLA policy.  If the request was approved, DiDomenico would tell the supervisor that the employee was on FMLA leave, and the supervisor would be responsible for ensuring the employee's duties were performed by someone else.

During the course of his employment, Ellison requested and was granted a number of leaves of absence for medical reasons, some of which were approved under the FMLA.  On October 25, 2004, he took a day off from work for medical testing.  From November 16, 2004 through December 13, 2004, he was granted a leave of absence under the FMLA in connection with injuries sustained in a car accident.  Ellison was authorized a leave of absence under the FMLA in connection with diverticulitis from April 25, 2005 through May 9, 2005.  From October 30, 2009 through November 9, 2009, he took an approved leave under the FMLA in connection with gastrointestinal bleeding relating to hemorrhoids, and from November 29, 2009 through December 7, 2009, he was away from his job for treatment related to diverticulitis. He also took time off from work on May 21, 2010 to consult with a

-5-

doctor about internal hemorrhoid bleeding.  His final leave of absence under the FMLA was for a month and three days in connection with outpatient surgery for hemorrhoids on June 9, 2010.[3]  During each of these leaves, Ellison received his full pay.

Mark Nace, Linda Tucker, and Bernardino Pezzente were the three individuals involved in the decision to terminate Ellison.  Tucker was the Human Resources Director and Pezzante was the Director of Operations.  Nace knew that Ellison had health problems because Ellison told him he suffered from internal bleeding.  Pezzente was also aware that Ellison had health problems because Ellison told him he was tired and needed time off, and Pezzente referred him to human resources.  Tucker was apprised of the fact that Ellison had taken medical leave since DiDomenico had notified her to this effect.  Ellison acknowledged he always had a good relationship with Tucker and could even call her at home.

During Ellison's absence in June 2010, his duties were performed by Nace, other Customer Pick Up associates, and other managers at the store.  Three other managers that Nace supervised were on leave around the same time.  Nace worked additional hours during this time and as a salaried employee was not paid overtime

---

3.  The dates of Ellison's June 2010 leave are ambiguous.  In some places, the record states he was out from June 1, 2010 to June 27, 2010.  In other places, it states he was on leave for a month and three days.  We will interpret the time period in Ellison's favor and find for present purposes that the last day of his leave was July 3, 2010.

when he worked more than 40 hours per week.  When Ellison returned from medical leave, Nace occasionally asked how he was doing.  Ellison replied he was "hanging in there" and doing "okay."  He also occasionally discussed his health with his other managers when they asked how he was doing.

Ellison has identified Linda Moore, Emilie Duggan, David Frankel, and Mark Nace as individuals who treated him with animosity.  Ellison's conflicts with Moore began soon after he transferred to the Oaks facility.  Moore was not his supervisor but rather another manager on his level.  He did not know why he and Moore did not get along but attributed it to their different personalities.

Emilie Duggan was the office manager.  She did not report to Ellison, and Ellison did not report to her.  He and Duggan got into an argument on one occasion.  Otherwise, they had a good relationship.  He attributed their one altercation to Emilie's personality.  He described her as, "the type of person that she wants to say what she wants to say and you have to let her."

Frankel, the Oaks store manager, called Ellison at home on one occasion and, using profanity, yelled at him.  Ellison did not know why Frankel did so.  Frankel also once shouted at him at work.  Frankel yelled at Ellison at work because one of the employees whom Ellison supervised had failed to follow through with a promise to a customer.  Both these incidents occurred after Ellison's surgery in June 2010.  Frankel, however, did not

-7-

take part in the discussions with Nace, Tucker, and Pezzante regarding Ellison's termination.

When asked why Nace treated him with animosity, Ellison stated, "Well, ever since I came back [from the June FMLA leave] – I couldn't really tell you.  Things just changed.  I don't know... I just know when I came back things started to change for me."  He also stated that when he returned from his June leave of absence, "things just fell apart."  Nace criticized him for not cleaning up his work area and for frequently failing to respond to emails.  When Ellison told Nace he felt he was being disrespected as a manager, Nace replied he should not feel that way.  He found Nace to be a "tough manager."  Ellison concedes he once hung up on Nace on the phone, an event which may have caused animosity.  Ellison also thought Nace had animosity toward him because Ellison was "the last of the greyhounds," that is, a person who had been at the company for a long time.  He was not sure if Nace treated him differently than he treated anyone else.

Ellison was suspended from employment in November 2010 following two different incidents involving his coworkers.  On November 6, 2010, he tried to talk to Linda Moore in the showroom, and she did not respond.  As he walked away, he heard Moore say something about Dave Frankel, and he turned around and told Moore that she and Frankel could "go to hell."  Moore and Ellison both prepared statements about this incident.  Around the same time, Emilie Duggan provided a statement alleging Ellison was loud in an open area and that she felt "disrespected and

intimidated" by him.  During this incident, Duggan told Ellison
to "shut the 'f' up."  Ellison prepared a statement for Nace
regarding this incident.  Ellison provided the statements
regarding the Moore and Duggan incidents to Nace via email.
After investigating these incidents, Nace spoke with Human
Resources Director Linda Tucker, and they agreed that Ellison
should be suspended for his role in the confrontations with Moore
and Duggan.  Nace issued a written warning to him on November 7,
2010 about these incidents, and Ellison was placed on a one day
suspension.  Duggan received a written disciplinary action in
connection with her incident with Ellison.

Following these events, Ellison met with Nace who told
Ellison that his performance needed to improve.  Nace also issued
him a "letter of clarification" describing how he should improve
his performance.  Tucker reviewed this letter before it was
delivered.  Nace convened with Ellison on December 13, 2010 and
December 17, 2010 to discuss his progress with his performance.

Ellison supervised a Customer Pick Up Clerk named Kate
Riggins at the Oaks store.  She was responsible for logging
various times relating to a customer's order into a time tracker.
When a customer purchases an item at the defendants' stores, a
sales associate inputs data into a computer and a sales ticket is
printed and provided to the customer.  The customer then takes
the ticket to an office, where a clerk, here Riggins, takes the
ticket and gives the customer a beeper.  The clerk then prints a
copy of the ticket for the warehouse employees, who then begin

locating each item on the ticket.  Once the items are located, the customer is notified via the beeper and instructed to go to the loading docket to retrieve the order.  Under the defendants' procedures, four times relating to the sales ticket were documented:  (1) the time the clerk received the sales ticket; (2) the time the warehouse received the sales ticket; (3) the time all the items in the order are ready for pick up; and (4) the time the customer responds to the beeper and picks up the items.

These procedures were the same during the year and four months Ellison was employed at the Oaks location.  In December 2010, he asked Riggins to deviate from these procedures and not report the actual time the customer picked up the items.  He found it unfair that if the warehouse had purchases ready for pickup but the customer delayed picking up the items that it would reflect badly on the warehouse employees.  Riggins told him she felt that he was "stealing" and that he was "getting her to cheat."  Ellison understood that he was asking Riggins to diverge from company policy.  He told Riggins that if she did not deviate from the policy as he asked that she would "get herself suspended."  Although Ellison admitted he had the authority to do so, he stated that he intended his statement to mean that one of their supervisors would suspend her because it looked as if the warehouse employees were working too slowly.

On December 20, 2010, Riggins sent an email to Nace and Tucker, in which she complained that Ellison threatened to

suspend her if she did not falsify the report.  Tucker then asked
Nace to obtain statements from them.  Nace told Ellison that
Riggins had registered a complaint with Human Resources about the
incident and asked Ellison to provide a statement so that Human
Resources would have his version of what happened.  While Ellison
responded that he would provide a statement, he never did so even
though Nace twice asked him for it.  According to Ellison, he
forgot to prepare the statement the first time Nace requested it
but after the second request he wrote it at home but left it in
his bag.  Nace never gave Ellison a specific deadline as to when
the statement had to be received and never told him that if he
did not provide a statement he would be terminated.

        The New Venture Holdings Policy and Procedure Manual
issued to Ellison in 2004 lists a series of offenses for which
discipline, up to and including termination, may be issued.  The
first enumerated offense is "[r]efusal to cooperate in a company
required investigation, including, but not limited to, refusing
to give requested information to management, a law enforcement
officer, or the Security and Safety Director."  Additional
offenses justifying discipline under the policy include,
"[f]ailure to follow supervisor's instructions, perform assigned
work or comply with policy," "[r]udeness, quarrelsome or annoying
behavior, or use of profane or abusive language to or in the
presence of a customer or employee," "[g]ross or repeated
insubordination including failure or refusal to carry out orders

or instructions," "[u]nsatisfactory work performance," and "interfering with the work of another associate."

On January 4, 2011, Nace contacted Tucker and recommended termination of Ellison's employment. Nace and Tucker described his failure to provide the requested statement as the "final straw" in his ongoing performance issues. All terminations at the company were reviewed by Human Resources. Tucker approved Nace's recommendation to terminate Ellison following consultation with both Nace and Pezzante and review of his personnel file, performance evaluations, discipline, and Riggins' statement.

On January 6, 2011, Nace told Ellison that his employment was terminated. At this time, he advised Nace his statement about the Riggins incident was in his bag in the office and he could go get it. Nace declined to see the statement at that time. Ellison later tore up the statement because he thought it was useless.

### III.

The FMLA entitles an eligible employee to a total of twelve workweeks of leave during any twelve month period if a serious health condition makes the employee unable to perform the functions of his position. See 29 U.S.C. § 2612(a)(1)(D). Neither party disputes that Ellison was an eligible employee. The FMLA creates two types of claims. First, there are interference claims, in which an employee asserts that his employer "interfer[ed] with, restrain[ed], or den[ied] the

exercise of or the attempt to exercise, any right provided under [the FMLA]."  The second type of claim is a retaliation claim, in which the employee claims that his employer "discharge[d] or in any other manner discriminate[d] against [him] for opposing any practice made unlawful by [the FMLA]."

Ellison has brought both an interference and a retaliation claim in this action.  Specifically, Ellison's complaint alleges, "[d]efendants have committed interference and retaliation violations of the FMLA by terminating Plaintiff (1) to prevent him from further exercising his rights under the FMLA; (2) because he exercised his rights under the FMLA; and (3) by considering his FMLA-qualifying absences in a decision to terminate Plaintiff."

We will first turn to Ellison's interference claim.  To establish an interference claim, "an employee must show that he was entitled to benefits under the FMLA and that his employer illegitimately prevented him from obtaining those benefits."  Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 401 (3d Cir. 2007).  One way to prevent illegitimately an employee from obtaining such benefits is to terminate the employee.  Id.  "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA."  Callison v. City of Philadelphia, 430 F.3d 117, 120 (3d Cir. 2005).  Here, there is no evidence that the defendants ever prevented Ellison in any way from taking FMLA leave.  To the contrary, it is undisputed that Ellison not only

-13-

took a month long FMLA leave in June 2010 but also that he took six other separate medical leaves throughout his employment with the defendants, three of which were under the FMLA.

There is also no evidence that the defendants fired Ellison to prevent him from taking additional FMLA leave in the future.  Nowhere in the record does Ellison state or imply that he was planning to take additional FMLA leave in the future. Rather, when his coworkers and supervisors asked how he was after he returned from his June 2010 surgery, he replied that he was "hanging in there" and doing "okay."  Ellison himself, in his deposition, never alludes to the possibility that the defendants fired him to prevent him from taking additional FMLA leave. Accordingly, we will grant the defendants' motion for summary judgment on plaintiff's interference claim.

We next address Ellison's retaliation claim.  An employer that terminates an employee in retaliation for having taken FMLA leave violates the FMLA.  See 29 U.S.C. § 2615(a); Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 147 n.9 (3d Cir. 2004).  Retaliation claims under the FMLA are analyzed using the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) burden-shifting framework.  See Conoshenti, 364 F.3d at 147. Accordingly, to be successful on his FMLA retaliation claim, Ellison must first show that he has a prima facie case, that "(1) he took an FMLA leave, (2) he suffered an adverse employment decision, and (3) the adverse decision was causally related to his leave."  Conoshenti, 364 F.3d at 146.  "[T]he prima facie

-14-

case under the McDonnell Douglas-Burdine pretext framework is not
intended to be onerous." Sempier v. Johnson & Higgins, 45 F.3d
724, 728-29 (3d Cir. 1995) (citations omitted).  It "raises an
inference of discrimination only because we presume these acts,
if otherwise unexplained, are more likely than not based on the
consideration of impermissible factors." Id. (citing Furnco
Constr. Co. v. Waters, 438 U.S. 567, 577 (1978)).

     If Ellison succeeds in coming forward with the prima
facie case, the burden of going forward will shift to the
defendants "to articulate some legitimate, nondiscriminatory
reason for the employee's rejection." McDonnell Douglas, 411
U.S. at 802.  If the defendants meet this burden, Ellison must
then show that the legitimate reasons offered by the defendants
were merely pretext for discrimination. Id.  The ultimate burden
of proof always remains on the plaintiff.

     There is no dispute that Ellison took multiple FMLA
leaves, the last one from June 1, 2010 to July 3, 2010, and that
he suffered an adverse employment decision when the defendants
discharged him on January 6, 2011.  With respect to plaintiff's
prima facie case, the issue is thus whether the record before the
court reflects a "material dispute of fact as to whether there
was a causal connection between the two." Conoshenti, 364 F.3d
at 147.

     To determine whether evidence of the required causal
link exists, cases often focus "on the temporal proximity between
the employee's protected activity and the adverse employment

action, because this is an obvious method by which a plaintiff can proffer circumstantial evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." Kachmar v. Sungard Data Sys., 109 F.3d 173, 177 (3d Cir. 1997) (internal quotations omitted).  Circumstantial evidence of a "pattern of antagonism" after the protected conduct, here the taking of FMLA leave, can also give rise to the inference of causation.  See id.  We look to the record as a whole to determine whether plaintiff has made out a prima facie case.  See id.

Ellison's last leave of absence before he was terminated ended on July 3, 2010, and he was discharged on January 6, 2011.  Accordingly, he worked for slightly over six months following his return from leave and prior to his firing. "Generally, it can be said that 'if at least four months pass after the protected action without employer reprisal, no inference of causation is created.'"  Urey v. Grove City College, 94 F. App'x. 79, 81 (3d Cir. 2004) (citing Woods v. Bentsen, 889 F. Supp. 179, 187 (E. D. Pa. 2000)).  Here, the more than six-month passage of time between the end of Ellison's last FMLA leave of absence and his termination does not raise an inference of causation.

Furthermore, Ellison has not produced evidence that he was treated with antagonism as a result of his taking FMLA leave. Ellison claims that four individuals treated him with animosity: his coworkers Linda Moore and Emilie Duggan, Store Manager David

-16-

Frankel, and his supervisor Mark Nace.  Moore and Duggan were Ellison's coworkers, not his supervisors.  They had no influence on any adverse employment action taken against Ellison. Animosity from coworkers cannot constitute retaliation because coworkers do not have any authority to carry out an adverse employment action.  Jensen v. Potter, 435 F.3d 444, 452 (3d Cir. 2006).

The antagonism from Frankel arose from two occasions in which Frankel yelled at Ellison, once on the phone and once at work.  Ellison testified during his deposition that he did not know why Frankel yelled at him.  Although Frankel supervised Ellison, he too had no role in the decision to terminate him. Only Nace, Tucker, and Pezzante participated in the discussions regarding whether to end Ellison's employment.  Accordingly, like Moore and Duggan, he could not have retaliated against Ellison because he did not participate in the adverse employment action against him.  Id.

Nace was only Ellison's supervisor for one month before Ellison took his June 2010 leave of absence.  Ellison alleges that Nace treated him with animosity after his medical leave. Specifically, Ellison maintains that Nace criticized him for not cleaning up his work area and not checking his email.  When asked why Nace treated him with animosity, Ellison stated, "Well, ever since I came back [from the June FMLA leave] – I couldn't really tell you.  Things just changed.  I don't know... I just know when I came back things started to change for me."  He also stated

that when he returned from his June leave of absence, "things just fell apart."

Furthermore, Ellison himself provided a number of non-discriminatory reasons for any animosity on the part of Nace.  As noted previously, Ellison thought perhaps Nace treated him differently because he once hung up on Nace on the phone and Nace thought he would hang up on him again.  Ellison also thought Nace had animosity toward him because Ellison was "the last of the greyhounds," which he described himself as because he had been at the company for a long time.  Ellison found Nace to be a "tough manager," and he described other employees as also feeling this way.  Ellison was not sure if Nace treated him differently than he treated anyone else.

None of this evidence about his relationship with Nace, even if admissible, supports any inference of causation between Ellison's leave of absence and his later termination.  Although Ellison has shown some animosity on the part of Nace, he has come forward with no evidence that it was related to his taking FMLA leave.  Rather, it is merely proof of clashing personalities in a challenging work environment.  Accordingly, we find that Ellison has not shown a prima facie case of retaliation.

Even if we had found that there was a causal connection between Ellison taking FMLA leave and his termination, the defendants have articulated legitimate reasons for Ellison's termination.  Ellison was disciplined on numerous occasions throughout his tenure.  Specifically, he was disciplined while at

the Langhorne store on March 13, 2009, April 26, 2009, and June 19, 2009.  He was then transferred to the Oaks store at the end of September of 2009, where he had less responsibility and earned a lower salary.  He was placed on a Performance Improvement Plan on October 4, 2009.  Then, in November 2010 he was involved in two incidents with other employees that led to a suspension.  Finally, in December 2010 he tried to convince Riggins to violate company policy and then failed to complete a statement regarding the event.  Furthermore, Ellison admitted at his deposition that he refused to put together the productivity reports requested by Nace and that Nace had to ask other employees to do this work instead.  Finally, he acknowledged that he once hung up the phone on Nace.

        The defendants have thus met their burden of articulating "some legitimate, nondiscriminatory reason for the employee's rejection."  McDonnell Douglas, 411 U.S. at 802.  Accordingly, to defeat summary judgment Ellison must come forward with evidence that the legitimate reasons offered by the defendants were merely pretext for discrimination.  Id.  To do so, Ellison must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted).  Further, Ellison's rebuttal

evidence must allow a factfinder reasonably to infer that each of the defendants' articulated non-discriminatory reasons was "either a post hoc fabrication or otherwise did not actually motivate the employment action." Id. (citations omitted). To do so, Ellison "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." Id. at 765 (internal quotations omitted).

        Ellison has failed to meet this burden of going forward. Ellison does not dispute any of the legitimate reasons for his termination which have been articulated by the defendants. Rather, he simply contends that he was disciplined more harshly than his coworkers Moore and Riggins who were not disciplined after the encounters he had with them, and more harshly than Duggan, who received written discipline whereas Ellison was suspended. We disagree that this evidence shows pretext. Riggins was not disciplined because she did nothing wrong. Ellison tried to convince her to violate company policy, and she refused. As for the incident with Moore, Ellison alleges that she ignored him when he tried to talk to her, and he then told her that she and Frankel, the store manager, could "go to hell." Moore alleges she ignored him because she was helping a customer. Then, around the same time, Ellison had a conflict

with Duggan.  Ellison was disciplined more harshly than Moore and
Duggan since he was being disciplined for two incidents, whereas
Moore and Duggan were only involved in one incident each.
Furthermore, Moore's behavior was not as bad as Ellison's.
Ignoring Ellison may have been rude, but any factfinder would
find that Ellison acted more rudely when he cursed at Moore and
their supervisor.

Ellison also contends that the defendants' proffered
non-discriminatory reasons are pretext for discrimination because
Nace did not provide Ellison with a deadline for turning in the
statement, and Ellison stated he could retrieve the statement
from his bag at his termination meeting.  However, at this point
the defendants had already made the decision to terminate
Ellison, both based on his failure to provide the statement and
the rest of his performance history, which was riddled with
disciplinary actions.  Moreover, Nace's failure to provide a date
by when he wanted Ellison to submit the statement would not cause
a factfinder to either disbelieve the defendants' articulated
legitimate reasons or believe that a discriminatory reason was
more likely a motivating cause of Ellison's termination.  Such a
statement needed to be turned in as promptly as possible.
Ellison did not do so.  In this case Nace had asked for the
statement not once but twice.  We accordingly find that Ellison
has not furnished evidence that the legitimate reasons offered by
the defendants were merely pretext for discrimination.

Ellison has not demonstrated that genuine issues of material fact exist in support of his claim of retaliation for taking FMLA leave.  Therefore, we will also grant summary judgment in favor of the defendants on this claim.